## TAGGART v. KEIM et al.
### No. 6718.

Circuit Court of Appeals, Third Circuit.
March 29, 1939.

Rehearing Denied May 11, 1939.

---

Guy K. Bard, Atty. Gen. of Pennsylvania, and Percival H. Granger, of Philadelphia, Pa., for appellant.

Franklin E. Barr, of Philadelphia, Pa., J. Hector McNeal, of Philadelphia, Pa., for original respondents-appellees.

Paul Freeman and Freeman, Fox & Steeble, all of Philadelphia, Pa., and Ralph W. Rymer, of Scranton, Pa., for appellees.

Before DAVIS, MARIS, and BUFFINGTON, Circuit Judges.

MARIS, Circuit Judge.

This is an appeal by the Insurance Commissioner of Pennsylvania as statutory liquidator of Independence Indemnity Company (hereinafter called the Independence), a Pennsylvania corporation, from a decree of the District Court for the Eastern District of Pennsylvania dismissing a bill in equity and supplemental bill filed by him against the ancillary receivers of International Re-Insurance Corporation (hereinafter called the International), a Delaware Corporation, and others. In order to understand the questions which the appeal raises, a somewhat full statement of the facts is necessary.

On September 16, 1931 the Independence was chartered as an insurance company by the Commonwealth of Pennsylvania as a result of the merger of several other insurance companies, some of which were in financial difficulty and unable to continue business alone. The Insurance Commissioner of Pennsylvania was un-

willing to issue a certificate of authority to do business to the newly formed Independence because of its unsound financial condition, and negotiations thereupon took place between the Independence and the International looking toward the reinsurance by the International of the liabilities of the Independence. As a result of these negotiations a treaty of reinsurance was executed on September 30, 1931, the contracting clauses of which were as follows:

"Now therefore, in consideration of the payment to International Re-Insurance Corporation of a premium equal to the entire assets of the Company, or such proportion thereof as may be necessary to liquidate the liabilities of the Company outstanding at the date hereof, and such liabilities as may accrue until the Independence Indemnity Company is shown to be satisfactorily rehabilitated financially conformably to the legal requirements of the State of Pennsylvania, the Reinsurer hereby reinsures all of the outstanding liabilities of the Company in addition to the liabilities mentioned in the Treaty of Reinsurance hereinabove referred to and existing as of the date of this agreement, and such liabilities as may be incurred hereafter by the Company until the Company shall be satisfactorily rehabilitated financially conformably to the requirements of the State of Pennsylvania.

"The Company upon its part agrees to pay International Re-Insurance Corporation in consideration of the obligations undertaken by it hereunder the amount of premium hereinabove set forth."

Under the Pennsylvania statute the Insurance Commissioner was required to examine and approve all such arrangements for reinsurance of companies doing business in the state and the treaty was, therefore, submitted to him in connection with the application of the Independence for a certificate to do business. Conferences were had between the officials of the Independence and the International and the Commissioner with the view to determining the advisability of authorizing the Independence to do business with the backing of the International as provided for in the treaty. In the course of these conferences and negotiations a question was raised as to when and how the International expected to be reimbursed for the liability assumed under the treaty; and in pursuance of the discussion the President of the International wrote on January 2, 1932 to the Commissioner confirming the arrangement of the treaty and stating that it was not the intention of the International to take over any more of the assets of the Independence than would be necessary to reimburse the International for the liabilities of the Independence paid or assumed. He also expressed in the letter the hope that the Independence might be rehabilitated and the International relieved from its obligations. Soon after the receipt of this letter the Insurance Commissioner approved the treaty and on March 2, 1932 issued a certificate to the Independence authorizing it to do business in Pennsylvania. The treaty of reinsurance was regularly adopted by the directors of the Independence on January 11, 1932, and the executive committee of the International formally approved it on April 26, 1932.

During this time the Pennsylvania Insurance Department was in the process of making a complete examination of the Independence for the purpose of determining its solvency, and about May, 1932 the examination was completed although the report was not officially filed by the Department until July 28th. It showed that the Independence was actually insolvent to the extent of about $700,000 as of December 31, 1931. Although the Independence was shown to be insolvent, the Insurance Commissioner on July 8, 1932 sent out a circular letter reciting the status of the Independence as to capital and surplus and stating that its liabilities had been satisfactorily reinsured with the International by the approved treaty and the Independence would continue the writing of insurance in the state. Further negotiations were had between the officials of the International and the Independence and the Insurance Commissioner with a view to determining the future of the business, and considerable correspondence passed between the parties and the Commissioner showing the urgency of the situation and the efforts made to adopt a satisfactory plan. It was agreed that because of the insolvency of the Independence it could not be permitted to continue and that it must either be taken over for liquidation by the Commissioner, or the International would have to take over its assets and settle its liabilities under the treaty of September 30, 1931.

In this situation the International proposed to take over the assets of the Independence and settle its liabilities as provided in the treaty. The Insurance Commissioner, having satisfied himself that the International was solvent and financially able to assume the obligations of the Independence, approved the proposal. Pursuant thereto, after authorization by its stockholders at an adjourned annual meeting held on October 31, 1932, the Independence executed an agreement and bill of sale of that date under which pursuant to the treaty of September 30, 1931 it conveyed to the International all its assets and the International assumed the obligation to pay and discharge all its liabilities, with the provision, however, that the International should reconvey such sum as should exceed the liabilities so paid by the International. The bill of sale was stated to be absolute and free and clear of any trusts and the International was expressly given full right of disposition of the assets conveyed. The agreement and bill of sale were approved by the Insurance Commissioner and the securities of the Independence on deposit with his Department were turned over by him to the International. The certificate of authority of the Independence was surrendered as of the same date and the Commissioner authorized the International to take over and continue the business of the Independence. At the same time the President of the Independence notified all of its agents that the International was behind its policies and that the same management and organization would continue to do business as the Independence Indemnity Underwriters of International Reinsurance Corporation. The same information was also published in general insurance publications.

Thereafter the International began to operate as a general insurance writing company but maintained as a separate organization for this purpose the officers, employees and records of the Independence. After the transfer some of the policies issued were those of the Independence, others contained explanatory riders, and when new forms were printed the policies were those of the Independence Indemnity Underwriters of the International. This course of operations continued until April 19, 1933. During this period a considerable number of persons procured policies from the International.

A number of these were purchased upon the strength of the amalgamation of the assets of the two companies and of the statements issued by the Insurance Commissioner and the President of the Independence.

On April 19, 1933 receivers were appointed by the Chancellor of Delaware for the International, which had then become insolvent. Shortly thereafter ancillary receivers for the Eastern District of Pennsylvania were appointed by the court below. Ancillary receivers were also appointed by the District Court for the Middle District of Pennsylvania and by a large number of other courts throughout the country. On May 11, 1933 the Insurance Commissioner of Pennsylvania, upon his own application, was appointed as liquidator of the Independence by the Court of Common Pleas of Dauphin County, Pennsylvania.

In January, 1934 the Insurance Commissioner filed his original bill in this proceeding, and later his supplemental bill, averring that the transfer of assets from the Independence to the International on October 31, 1932 was fraudulent and void and that the assets should, therefore, be restored to him and an accounting made of their disposition. The cause was referred by the court below to a special master who after lengthy hearings filed an exhaustive report recommending the dismissal of the bill for want of equity. Exceptions to his report were dismissed by the court below; which on February 9, 1938 entered a decree dismissing the bill for want of equity. After full consideration we are satisfied that it committed no error in so doing.

1. The treaty of reinsurance entered into between the International and the Independence on September 30, 1931 was a valid and binding contract. This much is conceded by the appellant, who contends, however, that the contract was in effect an agreement of guaranty which the Pennsylvania statute, 8 P.S.Pa. § 1, converted into an agreement of suretyship. We do not so construe it. The agreement by its terms was a contract of reinsurance. It provided that "the Reinsurer hereby reinsures all of the outstanding liabilities of the" Independence. It was a promise to indemnify the Independence and was made directly to that company and not to its policyholders, who could claim under it

only as donee beneficiaries. Since there was no privity between the persons originally insured by the Independence and the International as reinsurer it was a true agreement of reinsurance, and not a contract of guaranty. Goodrich and Hick's Appeal, 109 Pa. 523, 2 A. 209.

■ As a contract of reinsurance the treaty obligated the `International to indemnify the Independence against all its liabilities then outstanding and against those which might thereafter be incurred until the Independence should be financially rehabilitated to the satisfaction of the Insurance Commissioner of Pennsylvania. It obligated the Independence to pay to the International as a premium such proportion of the assets of the Independence as might be necessary to liquidate its liabilities. If by reason of the insolvency of the Independence it could not be rehabilitated it was clearly obligated to pay over to the International its entire assets since the entire amount would in that case be needed to meet its liabilities. Such an agreement by an insurance company reinsuring its entire schedule of policies in consideration of the transfer of its entire property, with the approval of the Insurance Commissioner, is contemplated by Section 502 of the Pennsylvania Insurance Department Act of 1921, 40 P.S.Pa. § 202, and by Section 319 of the Pennsylvania Insurance Company Law of 1921, 40 P.S.Pa. § 442.

■ We do not think that the letter written by the President of the International· to the Insurance Commissioner on January 2, 1932 modified the obligations of the treaty as we have outlined them. That letter was not addressed to the Independence, the other party to the treaty, and it merely informed the Commissioner that it was not the intention of the International to demand the transfer to it of the assets of the Independence, so long as the rehabilitation of the latter was possible, except as they might be needed to reimburse it for the payment of the Independence losses. The letter obviously referred to the relations between the parties pending the rehabilitation of the Independence and it was not intended to release the latter from its duty to convey all its assets in case its rehabilitation should become impossible because of its insolvency.

2. Prior to October, 1932 it became clear to everyone involved that the Independence was hopelessly insolvent and

had been at least since December 31, 1931. Its officers reported that they were unable to procure additional capital and its rehabilitation, therefore, became impossible. Only two courses were open to it, liquidation by the Insurance Commissioner or the transfer of all its assets to the International under the reinsurance treaty of 1931. The latter course was chosen with the approval of the Insurance Commissioner, if not at his insistence. There was no competent evidence that the International was not then entirely solvent. It agreed in good faith to take over the assets and business of the Independence and assume and pay all its liabilities in accordance with the `treaty of September 30, 1931, even though the transaction had become an obviously losing one for it. Pursuant to the agreement the Independence on October 31, 1932 by bill of sale conveyed all its assets to the International and they are now held by its receivers.

■ The appellant urged in the court below that this conveyance was procured by fraud. That court found, however, that no actual fraud had been shown and the appellant has not contended in this court that this finding was erroneous. Certainly the creditors of the Independence could hardly be said to have been defrauded by a transaction which provided them with a solvent debtor in place of an insolvent one.

The appellant argues, however, that the transfer must be deemed fraudulent under the Uniform Fraudulent Conveyance Act, 39 P.S.Pa. §§ 351 to 363. That act declares that "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." 39 P.S.Pa. § 354. The act further declares that "Fair consideration is given for property * * * When, in exchange for such ˴ property * * * as a fair equivalent therefor and in good faith * * * an antecedent debt is satisfied." 39 P.S.Pa. § 353. As we have indicated the treaty of reinsurance imposed upon the Independence the obligation to convey its assets to the international in consideration of the reinsurance granted by the latter. When its insolvency became apparent this obligation matured. It was an antecedent debt of

the Independence which was the exact equivalent of the property conveyed. Consequently the Uniform Fraudulent Conveyance Act can furnish no basis for the relief sought by the appellant. The defense of ultra vires also urged by the appellant is equally without support in the record and requires no discussion here.

3. Following the consolidation of the assets of the two companies by the conveyance of October 31st many policies of insurance were issued upon the faith of the combined assets in the hands of the International. Numerous claims upon these policies have matured and many of the creditors have intervened as parties defendant. To grant the relief sought by the appellant would deprive these creditors of assets upon which they are entitled to rely. As we have seen, legal title to the Independence assets is now in the International. The equity of these creditors in those assets is at least equal to that of the prior creditors of the Independence who, under the reinsurance treaty, will be entitled to share in them in the hands of the receivers of the International. In this situation the maxim is applicable that "Between equal equities the law will prevail." See Brill v. W. B. Foshay Co., 8 Cir., 65 F.2d 420; Dettra v. Kestner, 147 Pa. 566, 23 A. 889; Van Dyke v. Baker, 214 Pa. 168, 63 A. 594.

Decree affirmed.